OPINION
{¶ 1} Holly Schroeder appeals from a final judgment entry and decree of divorce issued by the Montgomery County Common Pleas Court, Domestic Relations Division. In its judgment entry, the trial court terminated Holly's marriage to defendant-appellee Damian Schroeder and resolved a number of issues, most notably involving spousal support and the division of marital assets and liabilities. *Page 2 
 {¶ 2} Holly advances three assignments of error on appeal.[1] First, she contends the trial court erred in finding her responsible for repaying a retirement-account loan. Second, she claims the trial court erred in treating certain savings bonds as marital property and valuing them at face value. Third, she asserts that the trial court erred in terminating her temporary spousal support on the final-hearing date rather than when the divorce decree was filed.
 {¶ 3} The record reflects that the parties were married in September 2001. They separated in January 2006. Holly filed a complaint for divorce the following month. The action proceeded to a September 28, 2006 hearing during which the trial court heard testimony from Holly, Damian, and Larry Liming, a real-estate appraiser who opined about the value of the marital residence.
 {¶ 4} The trial court subsequently filed a January 5, 2007 decision in which it made findings to resolve disputed issues. Of particular relevance here, the trial court found that Holly withdrew $25,000 in pre-marital assets from her 401(K) account during the marriage to make a down-payment on a house. The trial court also found that Holly later borrowed $9,800 from the 401(K) account to pay taxes and other expenses. The trial court determined that the tax liability had resulted in part from Holly's earlier withdrawal of the 401(K) funds. It noted that the balance on the 401(K) loan was $8,597.28 when the parties separated. It found Damian responsible for one-half of this debt. Finally, the trial court found that the parties had home equity of $25,420. It awarded Holly the first $25,000 of this amount because she had used pre-marital 401 (K) funds to make the down payment. The trial court ordered Holly to pay Damian $210 as *Page 3 
his share of the remaining $420 in marital equity.
 {¶ 5} On another issue, the trial court determined that Holly held thirty-seven U.S. savings bonds that were marital property. It observed that the bonds had a face value of $100, resulting in a total value of $3,700. The trial court awarded Damian one-half of this amount.
 {¶ 6} Finally, the trial court noted that the parties previously had submitted an agreed order requiring Damian to pay $250 per month as temporary spousal support commencing on February 3, 2006. The trial court found that the temporary support award was reasonable and appropriate. It noted that Damian had not made any of the required payments. It then found him obligated to make the payments from February 2006 through September 2006, when the final divorce hearing was held. This resulted in an arrearage of $2,000, which the trial court ordered Damian to pay.
 {¶ 7} The trial court subsequently modified its decision on February 2, 2007. It determined that the $9,800 loan referenced above had been used primarily to pay taxes owed as a result of Holly's 401(K) withdrawal for a home down-payment.[2] Because it had treated the $25,000 down-payment as Holly's separate property, the trial court found it equitable to treat the 401(K) loan for taxes on the withdrawal as her separate obligation. Therefore, the trial court concluded that Damian was not responsible for the *Page 4 
remaining balance on the loan. On June 5, 2007, the trial court filed a final judgment entry and decree of divorce that included the foregoing findings. This timely appeal followed.
 {¶ 8} In her first assignment of error, Holly contends the trial court erred in finding her solely responsible for the balance on the 401(K) loan discussed above. She argues that the bulk of the $9,800 loan was used to pay taxes stemming from Damian's self-employment. In support, Holly refers to a 2004 tax return purportedly showing Damian's self-employment income, capital gains, and tax liability. We note, however, that the tax return upon which she relies was not presented to the trial court or made part of the record below.[3] Nor are we aware of any testimony to support the figures she cites.
 {¶ 9} During the hearing below, Holly testified that she used $25,000 from her 401(K) account for a house down-payment. She stressed that the transaction was a withdrawal, not a loan.[4] (Tr. at 66). She also admitted incurring an obligation to pay taxes and penalties on the money withdrawn from her account. (Id. at 67). Holly additionally testified about the $9,800 loan at issue. She suggested that the loan may *Page 5 
have been used to pay a tax obligation resulting from Damian's self-employment. At the same time, however, she admitted that she had extra money taken out of her paycheck to cover Damian's annual tax obligation. She also admitted that the parties did not need a loan to cover Damian's tax obligation in any other year. (Id. at 67-68). When pressed about her suggestion that the $9,800 loan may have been unrelated to taxes and penalties stemming from her earlier withdrawal from the 401(K) account, Holly responded: "I do not know without having my CPA here." (Id. at 69).
 {¶ 10} Based on the record before us, the evidence supports a finding that the $9,800 loan was used primarily to pay taxes and penalties attributable to Holly's withdrawal of funds from her 401(K) account for a house down-payment. Because Holly failed to provide the trial court with a 2004 tax return or testimony supporting the figures contained in her appellate brief, we are left with: (1) her admission that the withdrawal of money from her 401(K) for a house down-payment resulted in a tax obligation and penalties; (2) her admission that she had extra money withheld from her paychecks to cover Damian's annual self-employment tax obligation; and (3) her admission that the parties never needed a loan to cover Damian's taxes in any other year. In light of these facts, the trial court reasonably could have inferred that the $9,800 loan was used primarily to pay taxes and penalties resulting from the 401(K) withdrawal.[5]
 {¶ 11} Finally, given that the trial court awarded Holly the $25,000 down-payment as her own separate property, it was not inequitable to find her responsible for the taxes *Page 6 
and penalties owed as a result of the 401(K) withdrawal. If the $25,000 down-payment was Holly's own separate property, then she reasonably bore responsibility for any financial obligation she incurred when accessing it. As a result, Holly has not demonstrated error in the trial court's decision to hold her responsible for the entire 401(K) loan. Her first assignment of error is overruled.
 {¶ 12} In her second assignment of error, Holly claims the trial court erred in treating thirty-seven $100 U.S. savings bonds as marital property and valuing them at face value. She characterizes the bonds as gifts to her minor children. Even if the bonds were marital property, she contends they had not yet matured when the parties separated. Therefore, she asserts that they should have been valued at less than their $100 face value.
 {¶ 13} In response, Damian claims the bonds were marital property because Holly purchased them during the marriage using a portion of her salary. He stresses that she had complete discretion to redeem the bonds and was under no legal obligation to use them for the children. With regard to valuation of the bonds, he argues that nearly all of them had reached maturity when the divorce decree was filed. He asserts that the remaining few were days away from maturing. As a result, he contends the trial court properly valued the bonds at their $100 face value.
 {¶ 14} Upon review, we find no error in the trial court's determination that the bonds were marital property. The record reflects that Holly bought the "Series EE" U.S. savings bonds through a payroll deduction for many years. She purchased three bonds every pay period for $50 each. (Tr. at 53-54). The bonds, which had a face value of $100, were made payable to Holly or one of her minor children. (Id. at 58; see also Def. *Page 7 
Exh. A). Holly testified that she purchased the bonds for her children and for a "little safety net" in case she needed money to pay bills. (Id. at 54-55, 80). Although she had aspired to save the bonds for her children, she owned only one year's worth at the time of the parties' separation. (Id. at 54). She "was selling them as fast as [she] possibly could to cover bills each month." (Id.). The proceeds were not used exclusively for the children's benefit. (Id. at 59). When the parties separated, Holly held thirty-seven bonds that had been purchased during the marriage. (Id. at 86).
 {¶ 15} As set forth above, Holly contends the bonds were the separate property of her children, who received them as gifts. "`[A]n inter vivos gift is an immediate, voluntary, gratuitous and irrevocable transfer of property by a competent donor to another.'" Long v. Long, Greene App. No. 07-CA-54, 2008-Ohio-3006, ¶ 39, quoting Smith v. Shafer (1993), 89 Ohio App.3d 181, 183. A fundamental characteristic of a gift is the donor's relinquishment of ownership, dominion, and control over the property. Gallo v. Gallo, Lake App. No. 2000-L-208, 2002-Ohio-2815, ¶ 28, citing Bolles v. Toledo Trust Co. (1936), 132 Ohio St. 21.
 {¶ 16} We recognize the possibility, of course, that a parent may need to retain a measure of custodial control over property gifted to a minor. Even allowing for such a possibility, the degree of Holly's control over and use of the savings bonds, coupled with her perception that they would serve as her financial "safety net," persuades us that the bonds were marital property despite her desire to save them for the children. The record contains no evidence that Holly ever held the bonds for any period of time in a custodial-type capacity. Instead, she regularly redeemed the bonds, which were payable to her or her children, as soon as possible and used the proceeds for ordinary household *Page 8 
expenses. Under these circumstances, the record supports the trial court's determination that the bonds were marital property rather than the separate property of Holly's children. Cf. Traylor v. Traylor
(Va.App. 1995), 19 Va. App. 761, 767, 454 S.E.2d 744, 747-748 (finding, with little analysis, that savings bonds made payable to either wife or her son were marital property); Davis v. Davis (Mo.App. 2003),107 S.W.3d 425, 433 (concluding that savings bonds titled solely in wife's children's name were not marital property).
 {¶ 17} We do find merit, however, in Holly's argument that the trial court erred in valuing the bonds. The record reflects that Holly held thirty-seven bonds she had purchased over the year before the parties' separation in early January 2006. During the final hearing, Holly provided uncontroverted testimony that the bonds matured one year after being purchased. (Tr. at 57). Therefore, accepting Holly's testimony, which the trial court did, the last of the thirty-seven bonds could not have matured until early January 2007. But the parties stipulated to the trial court's use of January 9, 2006 as the date to value their assets. (Tr. at 3). On that date, very few, if any, of the bonds would have reached one-year maturity. Accordingly, we conclude that the trial court erred in valuing the bonds at face value and awarding Damian one-half of $3,700.[6]
 {¶ 18} Given that a remand will be necessary for the trial court to calculate the value of the bonds on January 9, 2006, we wish to point out an additional valuation problem. In particular, we take judicial notice that Series EE U.S. savings bonds do not *Page 9 
mature one year after their purchase. See, generally,31 Code of Federal Regulations Part 351. The bonds at issue were redeemable after twelve months but for much less than their $100 face value. If Holly's testimony were correct, the bonds, which cost $50 each, would have a one-hundred percent annual rate of return. For the foregoing reasons, we sustain Holly's second assignment of error insofar as she contends the trial court erred in valuing her savings bonds.
 {¶ 19} In her third assignment of error, Holly contends the trial court erred in terminating her temporary spousal support on the final-hearing date rather than when the divorce decree was filed.
 {¶ 20} As set forth above, the parties separated in January 2006. In May 2006, they mutually agreed that Jeffrey would pay temporary spousal support of $250 per month retroactive to February 2006. The trial court filed the agreement as an agreed order. Following the September 28, 2006 final hearing, the trial court filed its January 2007 decision in which it found that Damian had not made any of the required payments. It declared him obligated to make the payments through the date of the final hearing, resulting in an arrearage of $2,000. On appeal, Holly insists that the trial court erred in not requiring Damian to continue the temporary spousal support payments through the filing of the final judgment and decree of divorce, which did not occur until June 5, 2007.
 {¶ 21} Upon review, we find Holly's argument to be unpersuasive. The record reflects that the trial court gave Holly precisely what she requested below. In a post-hearing brief, Holly argued as follows concerning spousal support:
 {¶ 22} "* * * Testimony by both Plaintiff and Defendant established that Defendant *Page 10 
has not paid any of the $250.00 per month in temporary spousal support he was Ordered to pay beginning February 3, 2006. Plaintiff is askingthis Court to award her $2,000 owed to her in back spousal support. Bothparties agree there shall be no further spousal support and this will not remain under the continuing jurisdiction of the Court." (Doc. #46 at 5) (emphasis added).
 {¶ 23} In its divorce decree, the trial court subsequently awarded Holly $2,000 for a temporary spousal support arrearage. In light of the request contained in her post-hearing brief, we certainly cannot say the trial court erred in limiting temporary spousal support to $2,000. Moreover, although temporary spousal support frequently is continued until the filing of a divorce decree, Holly cites nothing that required the trial court to continue Damian's obligation beyond the date of the hearing. Determining an appropriate amount of temporary spousal support is a matter left to the trial court's sound discretion. Harris v.Harris, Ashtabula App. No. 2002-A-81, 2003-Ohio-5350, ¶ 24. We see no reason why the trial court, in the exercise of that discretion, could not terminate Damian's temporary support obligation as of the final-hearing date. The third assignment of error is overruled.
 {¶ 24} Based on the reasoning set forth above, the trial court's judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.
GRADY, J., and DONOVAN, J., concur.
(Hon. George Glasser, retired from the Sixth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)
 Copies mailed to: *Page 11 
Kristen L. Kelly
Damian Schroeder
Hon. Denise L. Cross
[1] For purposes of clarity, we will refer to the parties by their first names.
[2] In its modification decision, the trial court referred to a "$16,162 loan against said 401(K)" for the payment of taxes on the earlier 401(K) withdrawal. (Doc. #50). This reference to a $16,162 loan is an obvious misstatement on the trial court's part. There was no dispute at trial that the loan at issue was for $9,800. The $16,162 figure cited by the trial court was the value of Holly's 401(K) account in January 2006, when the parties separated. (Tr. at 29). We note, however, that the trial court's misstatement did not prejudice Holly. In its subsequent divorce decree, the trial court simply found her responsible "for the debt on the 401(K) account." (Doc. #51 at 3).
[3] Accompanying Damian's pro se appellate brief as Exhibit 4 is a computer print-out of unknown origin. Although it is not a tax return, it appears to contain some figures pertaining to the parties' 2004 taxes. The print-out is dated July 23, 2007, which post-dates the September 28, 2006 final hearing in this matter and the filing of the trial court's June 5, 2007 divorce decree. Because the print-out was not presented to the trial court as an exhibit below, we cannot consider it on appeal. Jamison v. Jamison (Aug. 27, 1986), Montgomery App. No. 9452 ("We cannot consider on appeal evidence which was not presented to the trial court.").
[4] Although she was unsure of the exact amount, Holly testified that she actually took a little more than $25,000 out of the account. She used $25,000 for a down-payment, however, and used the remainder to cover incidental expenses associated with moving from an apartment into the newly purchased residence.
[5] Even if the parties used some portion of the 401(K) loan to pay Damian's self-employment taxes, as Holly asserts, the record below lacks sufficient information for us to determine how much of the loan was applied to Damian's taxes. Holly could not recall any specifics at trial, and the record lacks evidence to support the figures contained in her appellate brief.
[6] In arguing to the contrary, Damian relies on the date the divorce decree was filed, June 5, 2007, to value the bonds. Although all of the bonds were in existence for more than one year on that date, the trial court properly used the parties' agreed date of January 9, 2006 to value their property. *Page 1